UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

PATRICIA L. MECHLEY,

           Plaintiff,

                                             Case No. C-1-06-538

v.

PROCTER & GAMBLE DISABILITY
      BENEFIT PLAN, et al.,

                    Defendants.


## ORDER

This matter is before the Court upon Plaintiff's motion for judgment awarding benefits (Doc. 61); Defendants' motion to uphold the administrative decision and/or for judgment on the administrative record (Doc. 56); the parties' respective memoranda in support of and in opposition to said motions (Docs. 62, 63; Docs. 58, 64); Plaintiff's notice of supplemental authority (Doc. 66); and the parties' oral arguments presented at the hearing before this Court on June 11, 2008. (*See* Doc. 68). Also before the Court is the administrative record related to Plaintiff's underlying total disability claim. (Doc. 30, filed under seal).

### Procedural Background/The Parties' Claims

On January 22, 2007, Plaintiff Patricia L. Mechley filed her amended complaint in this action, setting forth a claim under the Employee Retirement Income Security Act of 1974 ["ERISA"], 29 U.S.C. § 1132(a)(1)(B), against Defendants Procter & Gamble Disability Benefit Plan ["the Plan"] and the Trustees of that Plan ["the Trustees"]. (Doc. 16). Plaintiff alleges that Defendants wrongfully terminated her partial disability benefits on June 26, 2007, and also denied her total disability benefits, to which she is entitled under the terms of the Plan. She

-1-

requests an award of benefits, together with interest, attorney fees, costs and other injunctive relief.

On April 25, 2007, Defendants filed, under seal, copies of the administrative record and of Plan documents relative to Plaintiff's disability benefits claim.  (*See* Docs. 27-29, 30).  In the denial decision included within that record, the Chairperson of the Plan Trustees sent Plaintiff's counsel a letter on February 16, 2006, affirming the second denial of Plaintiff's application for total disability benefits.  (Doc. 30, Tab 3, AR00004-6).  The letter stated that although "the Trustees concluded that [Plaintiff] was disabled as defined by Plan," her application for total disability benefits nonetheless was properly denied, based upon a determination that her disabling conditions were caused by work-related injuries compensable under workers' compensation law, for which the Plan expressly excludes coverage.  (*Id.*, Tab 3, AR00005).  In response to Plaintiff's request for reconsideration based upon her withdrawal of any claim for worker's compensation benefits, the Trustees denied her request, citing Plaintiff's purposeful failure to pursue a worker's compensation claim.  (Doc. 30, Tab 1, AR0001).

On December 14, 2007, Defendants filed their motion to uphold the administrative decision and/or for judgment on the administrative record.[1]  (Doc. 56).  Defendants claim that because Plaintiff abandoned a claim for worker's compensation benefits to which she had been determined to be entitled relative to the conditions for which she now seeks total disability benefits under the Plan, she is ineligible for disability benefits under the terms of the Plan.

---

[1]Because challenges to the denial of ERISA plan benefits are not subject to resolution via summary judgment, s*ee University Hosps. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 845 (6th Cir. 2000), the proper procedural device in such circumstances is a motion for entry of judgment affirming the denial of disability benefits.

On January 31, 2008, Plaintiff countered with her own motion for judgment awarding benefits.[2]  (Doc. 61).  Plaintiff argues that Defendants improperly terminated Plaintiff's partial disability benefits based on an application of "the incorrect definition of disability," and improperly disallowed Plaintiff's claim for total disability benefits based on an unsubstantiated conclusion that Plaintiff's disability is "related to [her] Worker's Compensation claim."  (*Id.*, p. 1).

On June 11, 2008, the Court heard the parties' oral arguments regarding the issues addressed in their respective motions and memoranda. This matter is ripe for decision.

## Applicable Standard of Review

A plan administrator's decision to deny ERISA benefits is subject to a *de novo* standard of review, unless "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989).  As to benefits decisions made under plans which do grant such discretionary authority regarding eligibility determinations, however, a court must apply an arbitrary and capricious standard of review.  *Id.; see also, e.g., Spangler v. Lockheed Martin Energy Sys., Inc.*, 313 F.3d 356, 361 (6th Cir. 2002); *Sanford v. Harvard Indus., Inc.*, 262 F.3d 590, 595 (6th Cir. 2001); *Washburn v. UNUM Life Ins. Co.*. 43 F. Supp.2d 848, 851 (S.D. Ohio 1998) (Dlott, J.), *aff'd*, 210 F.3d 373 (6th Cir. 2000).  Under that highly deferential, "least demanding form of judicial review," a court must affirm the administrator's decision if the record evidence offers a reasoned explanation for the decision.  *Davis v. Kentucky Fin. Cos. Ret. Plan*, 887 F.2d 689, 693 (6th Cir. 1989), *cert. denied*, 495 U.S. 905 (1990).

---

[2]A motion with the same heading filed by Plaintiff on December 14, 2007 (*see* Doc. 55) was voluntarily withdrawn by Plaintiff's counsel on January 31, 2008, and refiled the same day.  (*See* Doc. 61).

If a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest (*e.g.*, because the plan is self-insured by the employer, which employs the decision-maker), that conflict must be weighed as a factor in determining whether there is an abuse of discretion.  *See Firestone*, 489 U.S. at 115.  "[T]his simply means the court takes the conflict into account when determining whether the decision was arbitrary or capricious; the Plan is still entitled to that standard of review . . ."  *Mitchell v. Dialysis Clinic, Inc.*, 18 Fed. Appx. 349, 355 (6th Cir. 2001).  The fact that others advising the decision-maker also are acting for the benefit of the employer likewise does not change the standard of review.  *See id.*

**Findings of Fact**

1) From 1996 until she ceased working, Plaintiff was an employee of the Procter & Gamble Company, eligible for benefits under the terms of the Procter & Gamble Disability Benefits Plan.

2) The Plan defines "Total Disability" as follows:

> a mental or physical condition resulting from an illness or injury which is generally considered totally disabling by the medical profession.  Usually, Total Disability involves a condition of such severity as to require care in a hospital or restriction to the immediate confines of the home.

(Doc. 30, Tab 40, PD00004).

3) As to "Total Disability Benefits," the Plan provides at Article VI:

> This Plan shall not provide benefits if disability is due to illness, accident or injury which occurred while the Participant was performing work for the Company and for which compensation may be payable or is paid under the terms and provisions of a State or Federal worker's compensation law.  The Trustees may suspend the payment of any Plan benefits if there is potential coverage of the disabling illness, accident or injury under the terms and provisions of a State or Federal worker's compensation law until

> there is a final determination of whether there is such coverage. . .
> In any event, this Plan shall not pay benefits if there is any
> purposeful failure to apply for compensation under any State or
> Federal worker's compensation law in connection with a disability
> which should be compensable under such law.

(Doc. 30, Tab 40, PD00008).

4)  On or about August 16, 1996,[3] while employed by Procter & Gamble, Plaintiff was operating a forklift at work when she struck an overhead beam, resulting in injuries to her head and neck.  Plaintiff's worker's compensation claim for that accident originally was allowed by the Industrial Commission of Ohio for multiple facial and jaw fractures and post-traumatic stress disorder.  (*See* Doc. 61, Memorandum in Support, p. 1; Doc. 30, Tab 5, AR00031).

5)  Plaintiff thereafter continued to work for P&G through February 13, 2001, when she was injured in an automobile accident which caused her to lose some time from her job before returning to work.  (Doc. 61, p. 2).  After returning from that accident, Plaintiff continued to work through about July 12, 2002, when she fractured her left ankle by stepping into a pothole. (Doc. 30, Tab 39, AR00427; Tab 4, AR00010, AR00020).

6)  On July 29, 2002, Plaintiff submitted her initial application for disability benefits under the Plan, identifying July 12, 2002, as the first date she was unable to work.  Plaintiff's application certified that the conditions for which she was seeking disability benefits were not work-related, and that she had not previously received worker's compensation benefits for any similar conditions.  (Doc. 30, Tab 38, AR00191).  Plaintiff immediately began receiving benefits retroactive to July 19, 2002.

---

[3]Plaintiff's Motion for Judgment Awarding Benefits identifies August **10**, 1996, as the date of her forklift accident (*see* Doc. 61, Memorandum in Support, p. 1), but other sources in the record uniformly attribute that incident to August **16** of that year.  (*See, e.g.,* Doc. 30, Tab 5, AR00031).

7)  On July 15, 2002, Dr. Hal S. Blatman, Plaintiff's treating physician, completed what appears to be the first certificate in support of Plaintiff's disability claim, stating a diagnosis of "left fibula fracture," and a disability date of "July 12, 2002."  (Doc. 30, Tab 39, AR00422).  His August 22, 2002 certificate added diagnoses of "myofascial neck pain" and "temporomandibular joint dysfunction" in addition to the ankle fracture.  (*Id.*, AR00408).  The September 25, 2002 certificate cited only "fecal incontinence."  (*Id.*, AR00398).

8)  Out-patient notes from another doctor's October 8, 2002 evaluation of Plaintiff relative to the fecal incontinence issue stated that Plaintiff "has a history of significant jaw trauma following a forklift accident and has posttraumatic stress disorder as a result."  (*Id.*, AR00379, 395, 396).

9)  The October 21 and November 21, 2002 physician's certificates attributed Plaintiff's disability to "fecal incontinence," "rectal dysfunction," and "myofascial pain."  (*Id.*, AR00390, 384).  The December 23, 2002 certificate reflected only "rectal incontinence."  (*Id.*, AR00376).

10)  On January 15, 2003, Plaintiff was injured in another automobile accident.  (Doc. 30, Tab 4, AR00020; Tab 39, AR00364).  The emergency room report for that accident recorded complaints of jaw, neck, lower back and chest wall pain, and observed that Plaintiff "has a long history of bilateral temporomandibular joint problems."  (*Id.*, Tab 39, AR00364).  Her diagnosis on the January 22, 2003 physician's certificate was "whiplash injury," disabling her as of January 15, 2003.  (*Id.*, AR00369).  This and all subsequent physician's certificates of disability dropped any reference to incontinence issues.

11)  The diagnoses on Plaintiff's physician certificates dated March 8, 2003,  April 10, 2003, and May 7, 2003 were "pain multiple sites," "c[ervical] strain," and "chronic myofascial

pain syndrome."   The onset of Plaintiff's total disability also was backdated to July 5, 2002.

(*Id.*, AR00337, 327, 325).  The June 25, 2003 certificate diagnosed "pain multi site" and "leg

pain."  (*Id.*. AR00288).  This and all subsequent physician certificates adopted the total disability

date of July 5, 2002.

    12)  Dr. Blatman's certificates dated July 17, 2003 and September 30, 2003  cited

diagnoses of "pain multi sites," "c-strain," "chronic myofascial pain syndrome" and "leg pain"

as underlying Plaintiff's continuing disability.  (*Id.*, AR00271, 240).  His October 27, 2003,

November 25, 2003 and February 2, 2004 certificates dropped the "cervical strain" diagnosis,

but added diagnoses of neck pain, shoulder pain and chronic fatigue.  (*Id.*, AR000234, 224, 219)

The March 11, 2004, May 25, 2004, June 23, 2004, July 27, 2004, September 2, 2004, and

November 22, 2004 certificates also added a diagnosis of "headache."  (*Id.*, AR00213, 210, 203,

199, 197, 192).

    13)  On April 11, 2003, the Plan asked Plaintiff to submit to an independent medical

examination by Dr. Carl Shapiro, an osteopath.  (Doc. 30, Tab 33, AR00180).  Dr. Shapiro's

report from that exam includes Plaintiff relating her history of "chronic" jaw, neck and back pain

following her forklift accident in August 1996.  (Doc. 30, Tab 31, AR00168).  The report also

notes Plaintiff stating that her July 2002 ankle fracture and January 2003 automobile accident

"exacerbated" her previous injuries.  (*Id.*, AR00169).  Aside from brief references to post-

traumatic memory loss and border personality disorder (*id.*, AR00172, 175), Dr. Shapiro's report

did not address any psychological issues, remarking that he "do[es] not have the expertise to

evaluate this as a source of disability."  (*Id.*, AR00175).  Based on the information available to

him regarding Plaintiff's physical condition, he concluded that Plaintiff was "not disabled for

sedentary labor in the competitive workplace," with certain restrictions, as of April 29, 2003. (*Id.*, AR00177).

14) Following Dr. Shapiro's report, a case reviewer for Defendants recommended that Plaintiff's disability benefits be denied after May 27, 2003.  (Doc. 30, Tab 30, AR00163-64). Plaintiff's benefits were terminated as of that date.

15) Plaintiff returned to work at Procter & Gamble on May 28, 2003 (Doc. 30, Tab 28, AR00144), without challenging the Plan's total disability determination.  She again stopped working as of June 26, 2003, due to health-related complaints.  (*Id.*, AR00146).

16)  On August 11, 2003, the Plan Trustees first denied Plaintiff's application for total disability benefits, based upon "insufficient medical data to support Total Disability[ ] as defined in the Plan."  (Doc. 30, Tab 27, AR00140-41).

17)  Plaintiff appealed that denial decision by letter dated November 17, 2003.  (*Id.*, Tab 26, AR00136-39).

18)  On March 30, 2004, a motion was filed on Plaintiff's behalf before the Industrial Commission of Ohio, seeking additional allowances for dysthymia and post traumatic stress disorder as part of her previously worker's compensation claim relative to the August 1996 forklift accident.  (*Id.*, Tab 5, AR00031).  Among the documentation supplied in support of the requested amendment was a letter from Plaintiff's treating psychiatrist, Dr. Stephen Meredith. (See Doc. 30, Tab 19, AR00124).  The March 4, 2003 letter diagnosed Plaintiff with "Dysthymia," "Post Traumatic Stress Disorder," and "Significant medical stressors," and opined that Plaintiff "has been disabled since July, 2002."  Dr. Meredith's letter then attributed

Plaintiff's conditions to injuries she sustained in the 1996 forklift accident, and subsequent harassment by fellow employees.  (*Id.*, AR00124).

19) On May 3, 2004, Plaintiff provided Defendants with additional information in support of the appeal of her disability claim, including two letters from Dr. Meredith.  (*See id.*, Tab 19, AR00124-25).  The first letter was addressed to Plaintiff's attorney re her worker's compensation claim, and was the same letter offered in support of that claim.  (*Id.*, AR00124). The second letter, dated April 29 and addressed to the attorney representing Plaintiff in her disability claim under the Plan, stated that Plaintiff "is in essence homebound because of her physical and psychiatric symptoms."  (*Id.*, AR00125).

20)  In response to Plaintiff's newly submitted information, Defendants requested that Plaintiff submit to an independent psychiatric evaluation by Dr. Fred R. Moss on June 23, 2004. (Doc. 30, Tab 16, AR00105).  Defendants representatives asked Dr. Moss "to determine [Plaintiff's] current **psychological** status and her ability to return to the workforce, at P&G, or at another company, with or without restrictions."  (*Id.*, AR00106) (emphasis in original).

21) Dr. Moss submitted his report to Defendants.  (Doc. 30, Tab 15).  Setting forth diagnoses of major depression, panic attacks with agoraphobia, possible paranoid personality traits, and fibromyalgia pain syndrome, Dr. Moss concluded based on his evaluation that Plaintiff "is relatively incapacitated" (Doc. 30, Tab 15, AR00102), and "is physically incapable of returning to work in a safe way."  (*Id.*, AR00103).  Defendants did not ask Dr. Moss to attempt to attribute Plaintiff's symptoms or diagnoses to a particular cause, nor did Dr. Moss do so.

22) On July 14, 2004, the Chair of the Trustees issued a letter to Plaintiff's attorney, stating that the Trustees had determined that Plaintiff "is totally disabled as that term is defined due to her current psychological impairment," effective June 26, 2003. They further advised, however, that any disability payments would be suspended based upon Plaintiff's pursuit of "a Worker's Compensation claim for this same psychological condition," and noted their reliance on the Plan's provision that "[t]he Trustess may suspend the payment of any Plan benefits if there is potential coverage of the disabling illness . . . under . . . State . . . worker's compensation law . . ." (Doc. 30, Tab 14, AR00099-100).

23) Plaintiff, through her attorney, challenged Defendant's suspension decision. (Doc. 30, Tabs 10-13).

24) On May 18, May 21 and November 9, 2004, Plaintiff was examined by David J. Greenwald, clinical psychologist, for an independent psychological evaluation apparently requested relative to the worker's compensation action. (*See* Doc. 30, Tab 5, AR00040). Dr. Greenwald opined that Plaintiff's onset of chronic depression was "not directly attributed to the industrial injury." (*Id.*, AR0044). He also concluded that Plaintiff's primary physical complaints of back and neck pain were not related to her worker's compensation claim, and that his review of Plaintiff's records "d[id] not support the presence of the requested psychological/psychiatric conditions" (*i.e.*, post-traumatic stress disorder and dysthymia). (*Id.*, AR00052).

25) On June 9, 2005, the Industrial Commission granted Plaintiff's requested additional allowances for dysthymia and post traumatic stress disorder, finding them to be "causally related to and the result of the injury" Plaintiff sustained in the August 16, 1996 forklift accident. (Doc.

30, Tab 5, AR00031). Although Procter & Gamble filed an appeal from that decision (*see* Doc. 30, Tab 5, AR00033, 35), it dismissed its appeal on July 14, 2005 (*see id.*), resulting in a final decision granting the allowances in Plaintiff's favor.

26) On July 11, 2005, the Plan Trustees denied Plaintiff's total disability benefits claim. Noting that "Ms. Mechley's treating psychiatrist, Dr. Stephen Meredith, concluded that Ms. Mechley was totally disabled by dysthymia and post traumatic stress disorder," and that "Ms. Mechley filed a Workers' Compensation claim for these conditions," resulting in "her Wokers' Compensation claim ha[ving] been amended to include the addition of dysthymia and post traumatic stress disorder," the Trustees concluded that Plaintiff's "disability is specifically excluded from coverage by the Plan" provision excluding benefits for disabilities for which compensation may be payable under state worker's compensation law. (Doc. 30, Tab 8, AR00089-90).

27) On October 10, 2005, Plaintiff appealed the Plan's denial, submitting additional information in support of her claim. (Doc. 30, Tabs 7, 5).

28) On November 7, 2005, Plaintiff was evaluated by Dr. Michael E. Miller for an independent psychiatric examination. (Doc. 30, Tab 5, AR00055-59). Based on his examination, Dr. Miller concluded that Plaintiff's "[s]ymptoms of [d]ysthymia and [post traumatic stress disorder] do not preclude employment," and that plaintiff could "return to her former position" with "[n]o restrictions . . . relative to her psychological conditions." (*Id.*, AR00059). He also specifically found that "there are no PTSD symptoms relative to the actual forklift accident." (*Id.*).

29) By letter dated February 16, 2006, the Plan Trustees upheld their denial decision based upon the worker's compensation exclusion.  (Doc. 30, Tab 3, AR0004-6).

30)  Plaintiff requested reconsideration of the denial, submitting an affidavit attesting that she did not authorize the filing of the amended worker's compensation claim made on her behalf and would be withdrawing her request for benefits under that claim.  (Doc. 30, Tab 2, AR0002-3).

31)  The Trustees denied Plaintiff's request for reconsideration, relying on the Plan's exclusion for purposeful failure to apply for compensation under worker's compensation law. They informed Plaintiff that she had exhausted her appeal rights under the Plan.  (Doc. 30, Tab 1, AR0001).  This lawsuit followed.

32)  "Dysthymia" is defined as "any disorder of mood."  *Stedman's Medical Dictionary*, 24th ed. (1982).

**<u>Analysis</u>**

<u>Standard of Review</u>

Noting that the Plan at issue in this case explicitly grants the Plan's Board of Trustees discretionary authority to determine eligibility for Plan benefits (*see* Doc. 30, Tab 40, PD00013), Defendants urge that the "arbitrary and capricious" standard of review applies in this case.  (*See* Doc. 56, p. 3).  Plaintiff, however, presents various arguments (*e.g.*, that the Plan failed to follow its own written procedures, etc.) in support of her contention that this Court should conduct a *de novo* review.  (*See* Doc. 61, pp. ii-iv).

Without ruling on the merit of Plaintiff's contention to that effect, the Court nonetheless has chosen to apply the more rigorous *de novo* standard that Plaintiff advocates, as we find that

our analysis yields the same result, irrespective of the standard applied. This approach effectively disposes of all of Plaintiff's arguments directed toward the proper standard of review, without the need for further discussion. The Court thus has conducted its own review of and drawn its own conclusions from all evidence contained in the administrative record.

Partial Disability Benefits

Although Plaintiff's motion for judgment purports to set forth a claim for wrongful termination of partial disability benefits, her filings offer no evidentiary support for the rather critical assertion that she "applied for" and "received" partial disability benefits. (Doc. 61, Memorandum, p. 2). To the contrary, the record contains nothing to demonstrate that Plaintiff specifically applied for, qualified for or received partial disability benefits under the terms of the Plan at any time relevant to this case, nor that she preserved any such issue through her prior appeal submissions. Rather, as outlined thoroughly in Defendants' opposing memorandum, the record illustrates that Plaintiff applied for and received total disability benefits from July 19, 2002, until she returned to work on Mary 28, 2003, pursuant to Dr. Shapiro's determination that she could be accommodated in the workplace. (*See* Doc. 62, pp. 5-10). Because the issue of Plaintiff's entitlement to partial disability benefits is not properly before this Court, Plaintiff's motion for judgment is denied to the extent that it seeks a determination that Plaintiff is entitled to such disability benefits, and Defendant's motion for judgment on the administrative record as to that issue is granted.

Inadequate Notice and Review

Plaintiff also challenges the Defendants' denial decision as faulty due to Defendants' alleged failure to provide adequate notice of its initial denial decision, as well as Defendants'

-13-

alleged failure to afford Plaintiff and full and fair review of her disability claim.  Plaintiff's challenges fail on both bases.

The Plan Trustees' August 11, 2003 letter denying Plaintiff's application for total disability benefits, based upon "insufficient medical data to support Total Disability[ ] as defined in the Plan" (*see*  Doc. 30, Tab 27, AR00140-41), satisfied the notice requirements of 29 U.S.C. § 1133.

Similarly, Plaintiff has not proven that Defendants failed to comply with established Plan procedures so as to deny her a full and fair review of her disability claim.  Rather, the record as a whole supports a conclusion that all decisions to deny Plaintiff benefits were made by the designated Plan fiduciary as part of a deliberate, principled reasoning process.  (*See* Doc. 30). Fiduciaries' reliance on the advice of others in making a denial decision also does not render the procedure faulty.  *See Mitchell*, 18 Fed. Appx. at 355.  Plaintiff's motion for judgment on the basis of the procedures utilized by Defendants  therefore is denied.

<u>Nature and Cause of Plaintiff's Disability</u>

Because Defendants have conceded that Plaintiff is totally disabled (*see, e.g.,* Doc. 62, p. 3; Doc. 30, Tab 14, AR00099), Plaintiff's remaining multitude of arguments challenging Defendants' denial of total disability benefits to Plaintiff under the Plan in essence can be reduced to a single pivotal question: whether Defendants lacked a proper basis for their conclusion that the conditions for which Plaintiff seeks total disability benefits under the Plan are work-related conditions for which compensation would be payable under Ohio worker's compensation law, were Plaintiff to seek such compensation.

Axiomatically, actions involving state worker's compensation laws generally are not reviewable by federal district courts, *see* 28 U.S.C. § 1445(c); *Subra v. CMS Therapies*, 900 F. Supp. 407 (M.D. Ala. 1995), and the decision of the Industrial Commission of Ohio relative to Plaintiff's worker's compensation claim is not subject to review in the case before us. Accordingly, whether or not this Court would draw the same conclusions from the evidence before the Industrial Commission, the fact nonetheless remains that the sole government entity empowered to determine what conditions are or are not compensable under Ohio worker's compensation law has decided definitively that Plaintiff's dysthymia and post traumatic stress disorder conditions are or would be compensable under Ohio worker's compensation law as part of her worker's compensation claim relative to her August 1996 forklift accident. Plaintiff's purported voluntary withdrawal of her worker's compensation claim for those additional conditions does not undermine the effect of that final decision.

Given that constraint, the main thrust of Plaintiff's argument faces a daunting challenge. Plaintiff protests that the Plan Trustees did not have an adequate factual basis for finding that Plaintiff's disability was the result of her August 1996 forklift accident. The Plan Trustees, however, could reasonable rely upon the **legal** conclusion of the Industrial Commission of Ohio as support for the Trustee's own conclusion that Plaintiff had a viable worker's compensation claim for work-related post-traumatic stress disorder and dysthymia.

Nevertheless, the Industrial Commission's finding does **not** compel this Court to find that dysthymia and post traumatic stress disorder related to the forklift accident are necessarily the conditions that disable Plaintiff for purposes of total disability benefits under the Plan. Based on our *de novo* review of the medical evidence in the administrative record, however, we agree with

the Plan Trustees' conclusion that Plaintiff's dysthymia and post traumatic stress disorder ARE disabling conditions, and DO relate back to her 1996 injuries.

The most compelling evidence to support this conclusion comes from Plaintiff's own treating psychiatrist, Dr. Meredith, who opined that Plaintiff had been disabled since July of 2002 due to dysthymia, post traumatic stress disorder, and "[s]ignificant medical stressors" that his letter implicitly tied back to Plaintiff's 1996 forklift accident. (*See* Doc. 30, Tab 19, AR00124). Notwithstanding Plaintiff's protest that Dr. Meredith's letter "does not say what [Defendants] believe[ ] it says" (*see* Doc. 58, p. 9) – *i.e.*, that "Meredith never states that the disability is related to the industrial accident" (*see* Doc. 58, p. 11) – Meredith's implication to that effect is inescapable. Dr. Meredith's subject letter is only one page long. After setting out Plaintiff's diagnoses, Dr. Meredith relates the history of Plaintiff's forklift accident "result[ing] in significant medical injuries," "[c]omplicat[ed]" by harassment from fellow employees. He then proceeds to list Plaintiff's "psychiatric symptomatolgy" without mentioning any other possible causes for such symptoms, and concludes that Plaintiff "has been disabled since July, 2002" due to "both her psychiatric and her medical problems." (Doc. 30, Tab 19, AR00124).

Moreover, given that Dr. Meredith's letter was acquired by the attorney representing Plaintiff in her worker's compensation case, and in fact was submitted in support of her worker's compensation claim, there can be little doubt that Dr. Meredith's letter was intended to establish a link between Plaintiff's psychiatric symptoms and her forklift accident. Accepting Dr. Meredith's opinion as establishing such a connection, then, is not only a reasonable conclusion, but the most logical one to be drawn.

That conclusion also is bolstered by substantial other evidence in the record.  Beginning in 2002, Plaintiff's primary treating physician, Dr. Blatman, listed "myofascial neck pain" and "temporomandibular joint dysfunction" as diagnoses contributing to Plaintiff's disability.  (See Doc. 30, Tab 39, AR00408).  A doctor to whom Plaintiff was referred in October 2002 noted in out-patient notes that Plaintiff "has a history of significant jaw trauma following a forklift accident **and has posttraumatic stress disorder as a result**."  (*Id.*, AR00379, 395, 396) (emphasis added).  Dr. Blatman's subsequent physician's certificates of disability continued to cite Plaintiff's "pain multiple sites," "c[ervical] strain," "chronic myofascial pain syndrome," and leg, neck and shoulder pain as underlying causes of Plaintiff's disability.  (*Id.*, AR00337, 327, 325, 288, 271, 240, 213, 210, 203, 199, 197, 192).  The emergency room report for Plaintiff's January 15, 2003 automobile accident recorded complaints of jaw, neck, lower back and chest wall pain, and observed that Plaintiff "has a long history of bilateral temporomandibular joint problems."  (Doc. 30, Tab 39, AR00364).   In April of 2003, Plaintiff recited to the doctor conducting her independent medical examination a history of "chronic" jaw, neck and back pain following her forklift accident in August 1996 (Doc. 30, Tab 31, AR00168), and reported that her July 2002 ankle fracture and January 2003 automobile accident "exacerbated" her previous injuries.  (*Id*., AR00169).  Although that doctor alluded to some psychological issues (*id.*, AR00172, 175), he specifically declined to address them as a source of disability, due to a lack of expertise.  (*Id.*, AR00175).

The overall impression gleaned from the cumulative medical evidence in the administrative record, then, is of a woman with a lengthy, well-documented and enduring history of medical and psychological symptoms that she herself frequently related back to her 1996

forklift injury.  Although Plaintiff now argues that a disability determination beginning in 2003 is too far removed in time, and preceded by too many other intervening event, to be traced back to the 1996 accident, the record suggests otherwise.  The medical documents reflect Plaintiff blaming subsequent accidents and injuries for "exacerbat[ing]" her medical problems (*see, e.g.,* Doc. 30, Tab 31, AR00169), suggesting her acknowledgment that the original 1996 accident remained the underlying cause.  The causes consistently cited by Plaintiff's primary treating physician in completing disability certificates all related to problems triggered by the 1996 injury, and Plaintiff herself attributed her post traumatic stress disorder to the same forklift accident.  (Doc. 30, Tab 39, AR00379, 395, 396).  Indeed, the record shows that even prior to the March 30, 2004 motion to add allowances for dysthymia and post traumatic stress disorder as part of Plaintiff's previously worker's compensation claim relative to the August 1996 forklift accident, the Industrial Commission **already** had recognized post traumatic stress disorder as a condition allowed under that claim.  (*See* Doc. 30, Tab 5, AR00031).  Plaintiff herself acknowledges that fact.  (*See* Doc. 61, Memorandum in Support, p. 1 ("[Plaintiff] . . . was injured in a forklift accident . . . that was recognized in a Worker's Compensation claim for . . . post-traumatic stress disorder . . ."); *see also* Doc. 30, Tab 5, AR00043).  In light of the record, the Court concludes that Plaintiff's most persistent medical problems and related psychological problems can be traced back to her work-related injury in August 1996.

Plaintiff suggests that the weight of the evidence cannot sustain that conclusion, given the conflicting evidence in the form of opinions from Drs. Greenwald and Miller.  The Court disagrees.  Dr. Miller opined that Plaintiff was not disabled.  (Doc. 30, Tab 5, AR00059).  The

overwhelming record evidence to the contrary convinces us to discount that opinion.[4]  The crux

of Dr. Greenwald's opinion, conversely, was limited to a conclusion that Plaintiff did not suffer

from dysthymia and post traumatic stress disorder as a result of her forklift accident.  (Doc. 30,

Tab 5, AR00040-54).  It is appropriate to take into consideration, however, that this opinion was

rendered by a clinical psychologist retained by a party seeking to avoid worker's compensation

liability, who examined Plaintiff solely for the purpose of generating an opinion to be used in the

worker's compensation case.  Accordingly, assigning less weight to such evidence than to the

opinions of Plaintiff's own treating psychiatrist and treating primary physician is entirely

reasonable.  Both the Industrial Commission and Defendants appear to have done so; the Court

does so as well.  Accordingly, we accept Dr. Meredith's conclusion, as bolstered by other

evidence of record, that Plaintiff has been disabled since July of 2002 by  dysthymia, post

traumatic stress disorder, and "[s]ignificant medical stressors" resulting from Plaintiff's 1996

forklift accident.  (*See* Doc. 30, Tab 19, AR00124).

     Applicability of Exclusion

     The Plan under which Plaintiff seeks disability benefits expressly provides that no

benefits are available for disability "due to illness, accident or injury which occurred while the

Participant was performing work for the Company and for which compensation may be payable

or is paid under the terms and provisions of a State or Federal worker's compensation law."

(Doc. 30, Tab 40, PD00008).  Such exclusions in employee benefit plans are both common and

enforceable.  *See, e.g., Marquette General Hosp. v. Goodman Forest Indus.*, 315 F.3d 629 (6th

Cir. 2003); *Mitchell*, 18 Fed Appx. at 349.  Our determination that the evidence supports a

---

[4]Indeed, Plaintiff, too, surely does not advocate that either the Court or Defendants adopt Dr. Miller's
opinion regarding Plaintiff's ability to return to work as credible.

conclusion that Plaintiff's disability is a result of her 1996 forklift accident means that Plaintiff's disability "may be payable . . . under the terms and provisions of" Ohio worker's compensation law, and thus triggers that Plan exclusion.

The Plan further provides that the Trustees "may suspend the payment of any Plan benefits if there is potential coverage of the disabling illness, accident or injury under the terms and provisions of a State or Federal worker's compensation law until there is a final determination of whether there is such coverage. . . " (Doc. 30, Tab 40, PD00008). Accordingly, the Trustees were justified under the Plan in suspending the payment of disability benefits to Plaintiff upon learning of the pending worker's compensation claim filed on her behalf.

Plaintiff, however, presented to the Plan Trustees an affidavit stating that the claim for additional worker's compensation allowances was initiated without her knowledge or consent, and asserting her intention that such claim be withdrawn.[5] (Doc. 30, Tab 2, AR0002-3). She now appears to suggest that such affidavit is sufficient to render the exclusion inapplicable, because no benefits are payable on a voluntarily-withdrawn claim. That argument is contravened by yet another Plan provision, however, stating that this Plan "**shall not** pay benefits if there is any purposeful failure to apply for compensation under any State or Federal worker's compensation law in connection with a disability which should be compensable under such law." (Doc. 30, Tab 40, PD00008)(emphasis added). Neither the allegedly inadvertent nature of Plaintiff's application nor the voluntarily withdrawal of her application for worker's compensation benefits to which she may have been entitled – and to which the Industrial Commission indeed determined that she **was** entitled – allows her to escape the consequences of

---

[5]Given Plaintiff's participation in medical evaluations undertaken specifically for purposes of her worker's compensation claim, her professed lack of knowledge seems suspect.

the Plan provision disallowing benefits to those who purposefully fail to apply with regard to disabilities "which should be compensable."  The fact that Plaintiff apparently has not collected any worker's compensation benefits for the additionally allowed conditions of dysthymia and post traumatic stress disorder does not and will not make her eligible for total disability benefits under the terms of the Plan.

<u>Waiver</u>

Finally, Plaintiff contends that Defendants should be deemed to have waived the right to apply the aforesaid exclusions to disallow her total disability benefits claims due to their failure to assert such exclusions earlier in the administrative process as a basis for denying such benefits.  On its face, the delay of some seven years from Plaintiff's 1996 forklift injuries to Defendants' 2004 denial of benefits on the basis of the worker's compensation exclusion might appear excessive.  As Defendants aptly note, however, they had no reason to raise such exclusions as a bar to Plaintiff's total disability application until they had reason to be aware that Plaintiff's disability might be compensable as a work-related injury.  The record supports Defendants' contention that they had no basis for believing that the Plan's worker's compensation exclusions might apply until they became aware of Dr. Meredith's 2003 letters suggesting a connection between Plaintiff's forklift accident and her then-current complaints.  Under such circumstances, the delay does not constitute a waiver.

For the foregoing reasons, we hold that Defendants are entitled to judgment on the administrative record, in their favor and against Plaintiff on her disability complaint herein, in its entirety.

IT THEREFORE IS ORDERED that Defendants' motion for judgment on the administrative record (Doc. 56) hereby is GRANTED, and that  Plaintiff's motion for judgment awarding benefits (Doc. 61) hereby is DENIED with prejudice.  Defendants' alternative motion to uphold the administrative decision (Doc. 56) hereby is DENIED as moot.

The Clerk of Courts hereby is DIRECTED to enter judgment in favor of Defendants the Procter & Gamble Disability Benefit Plan and Trustees of the Procter & Gamble Disability Benefit Plan, and against Plaintiff Patricia L. Mechley.

This matter is TERMINATED on the docket of this Court.

**IT IS SO ORDERED**.

 s/ Herman J. Weber        
Herman J. Weber, Senior Judge
United States District Court